The next one. Okay, Athos Overseas Limited Corp. v. YouTube. Mr. Ortega. Good morning, Your Honors, Judge Joe Pryor, Judge Jordan, Judge Marcus. We are ways away from where the original Viacom cases, or as YouTube likes to call it, their own cases, YouTube cases, originally set forth as to whether in fact there is some sort of obligation here. The magistrate judge's decision on summary judgment was improper for two reasons. First, there is no question that YouTube knew of the actual material that needed to be removed. You say that, but that's not exactly right because it all boils down to your definition of the material. Your position, I think, is this. Your position is that once your clients provide notice to YouTube about a certain video being infringing, YouTube, through its technology, including the ID thing and the fingerprint results that come about, now they know that you have a copyrighted product, Movie X, and that they should be searching their database, not only going backwards but going forwards, to see if there's any other clip that matches in any way your copyrighted product, right? That's your claim. That is not our claim. What is your claim? Our claim is further that YouTube did, in fact, do it. The difference being... No, but how can... What do you define the material in the statute as? The material in the statute is... What does the material mean in terms of the... The statute defines material as, and I have the statute here, but it is the images or the items sufficient for YouTube to identify, or the ISP, to identify the copyrighted work. And there's no question, no one here has questioned... YouTube doesn't question that they, in fact, found these items. YouTube's position is not, we haven't looked for it. YouTube's position is, we do it automatically, and that was the testimony. We do it automatically before anything gets uploaded to see if there's a match to the copyrighted work, the item, the material that is being challenged. And that's why summary judgment was inappropriate, because if, as the testimony was, YouTube has, in fact, before it loads up anybody else's content, done the search to see if there's a match through its fingerprint technology that no one has asked it to do, which is why it's fundamentally wrong that YouTube alleges that we are demanding that. We are not demanding that. We are far afield from 20 years ago when the theory could be, well, we don't do that. I thought the Zeus testimony was consistent that content ID operates based on reference material provided by the copyright holder. That's actually inconsistent with Zeus testimony as cited in our briefs. Zeus testimony, yes. Zeus wanted an affidavit, which he submitted, that says, we use reference material, but Zeus also testified to my question at deposition and as part of the brief that they do not need reference material to be submitted to be able to determine whether it is the material that's infringing or not. In fact, to be clear. Well, there can be statements that are provided. I mean, something can be posted, and the copyright holder can come forward and give the statement that, look, we have a good faith belief that this is a violation. Here's why. That's a different question, right? Yes, of course. But that's not what we're talking about here. Here, the way this works and the evidence- They don't automatically run content ID, though. They do. That's the testimony was-  I will find it for you in a second, but they specifically, when I come back on I'll give you the exact site, they specifically run, their testimony was, the second somebody uploads any content, we automatically fingerprint it to match it to other content to verify whether it was flagged content before. That was their testimony. What they wanted, and what they've attempted to argue in their brief, is that we are required to use the content ID system that they have. And that is not what's required under the statute. That is not what's required. And for purposes of, regardless of whether this court agrees with the second or the ninth, the question for purposes of summary judgment was, was your evidence sufficient to determine, for a jury to determine, that they had red flag knowledge, and whether they sought expeditiously to remove the content. So if they, if YouTube tomorrow decides it's not worth the hassle and does away with the ID and the resulting fingerprint, what's your position? My position would be that then they, they have not, in fact, they are not in possession of red flag knowledge, unless they of course come into possession of it. But the reason that that's a hypothetical that, while interesting, will never happen is because we cannot lose sight of the fact that YouTube is doing this, not for its altruistic nature and for free speech. They're doing this because they are making billions of dollars on the, on the backs of people who do have copyrighted content. And so YouTube does it because they are themselves are promoting their own product. They themselves are promoting their own advertising. So the fact that they did it doesn't somehow now say, well, I know you did it, but you, you don't have to worry about it that you now have red flag knowledge because you found it, because we're gonna, we're gonna forgive you because you did it. And that's, and that's essentially what YouTube's position is. What does YouTube do about possible use in clips of copyrighted material that may not be infringing? That's the easiest answer, and it's a red herring when they put it in their brief, and I'm glad that the court asked me. It's simple. There is a notice given to anyone whose information is taken down or blocked. And they have a right to file their counter saying, that's not true, we're entitled to do that, because it is first use, because it is educational purposes, whatever it is. But they have a right to do that. But what has happened here is- But, but when you file a takedown notice, you provide YouTube with your view that there's infringing material. Correct. In this case, YouTube has gotta figure out whether or not the material is infringing or not on its own. Absolutely not, your honor, and I disagree with that. You just, you just said they have to provide notice and have the user provide a counter. Correct, once I- They're doing it on their own. They are not doing it on- You're not involved in the, in the game. Of course I am. I'm involved in the game the moment I've put them on notice and- No, no, no, no, no, not about the infringing material. Of course. Because you don't want to be doing that. You don't, you don't want to be filing the thousands of takedown notices, right? I do not want to be filing the repeated thousands of takedown notices. Right, you, your position is, and it may be right, your position is that once you tell them, I own the copyright to movie X. And by the way, there's a clip on your system that we think is infringing. Now, YouTube, by virtue of its technology, has a statutory obligation to not get safe, to not get safe harbor, to now police every single clip that potentially infringes on movie X. That's your position. No, your honor, no, it is not. Tell me what I've missed. What you've missed is that the second I've already put them on notice, that this item is infringing. No, you're not putting them on notice. You want them to do it on their own because you don't want to file a takedown notice. No, your honor, no, that's, I apologize, but that's not our position. And if I can clarify, our- Tell me what, tell me, tell me in all of these cases, did you file, in the clips that issue, did you file takedown notices? Yes. Okay, and what did YouTube do that was, that constituted secondary copyright infringement? The, what they did was the following. For example, the movie Mi Querido Viejo, and we'll translate that at some point. In that movie, we noticed, we put them on notice that as a copyrighted movie, there's not authorization to do it. That's, that one- They took it down, right? They took it down that one time. Yeah, right. But every other instance that was already in the system for which- Which is why Judge Jordan just asked that question. And I'm going to- Once you said it once, then your position is, that now they have to search every other time it appears. No, that is not my position, and here's why. And you say that they're able to do it because of their technology. Now, that may be statutorily right, but that has to be your position, because you think that obligation carries forward. It's not a backward looking obligation. That you're imposing that obligation for everything that gets filed, going forward in the future, that right now, YouTube has no knowledge about, because it hasn't yet been filed. And the problem with that last statement, Your Honor, is that it's inconsistent with the facts of this case. It's inconsistent with the evidence in this case, and this is why. If you- Mr. Jordan. This is not difficult. This part is not difficult. Understood. Okay. If you're right, let's use the movie you just talked about. Sure. You've told them, we have copyright on this movie. And by the way, here's a takedown notice on this clip on your system. They take it down. What you want is, every time there's another clip that potentially infringes on that movie, you want them to start the whole possible infringement process by sending a notice to the user, telling them we've identified potential copyright infringement. We think there might be infringing. Tell us why it's not infringing, without you having to send out a takedown notice. If I may- What have I missed? I'm going to finish the answer because I'm past my time, but the answer is very simple. At the moment that we gave them that takedown notice, they knew of other infringing locations. But they- So it only applies to the ones that are already there and not to any future instances of it being placed? At a minimum? No. No, no, no, no, no. It can't be a minimum. Which is it? Well, because I think it's both, but at a minimum. Okay, because Judge Jordan's right. That serves you with nothing because then going, it'll serve you on a day, and on that day you cleanse the YouTube system because YouTube has to now send out potential infringement notices for everything it has with your movie. But if you're trying to stay at a minimum and limit it, then that means YouTube has no further obligation in the next 30 days, six months, or five years when other clips are uploaded. It doesn't have to do anything. The reason that- Your position has to be an all or nothing one. Or otherwise, in the next 30 days, six months, or 10 years, you're gonna continue to file takedown notices. Judge, but the reason that it's twofold in white, I do not want to be bound by, oh, it only is this, is the following. The testimony without question is that the moment they did it, they fingerprinted it so they know the location of the entire library. So they cannot simply say, when somebody else comes up, that was your testimony, that the reason they fingerprinted is that when somebody comes to upload it- I'm not talking about possibilities and what they can do and what they can't do. And I said, you may be statutorily right. I just want to make sure that I understand what your argument leads to, and you seem to be resisting that. I do not want to resist something that is a positive result. You want them to police, once you give them notice that you have a copyrighted movie, and this will be my last point. Once you give them notice that you have a copyrighted movie based upon the technology they have, you want them going forward in the future without limit to police any clips that come in that might be possibly infringing. If they don't do that, they lose the safe harbor. Mr. Ortega, you can respond to that, and then we'll be done with your opening. My response- And you won't lose rebuttal. I appreciate it. My response, Your Honor, is I want them to comply with the statute that specifically says that if they are on red flag knowledge, don't call it red flag, but if they have red flag knowledge that they have uploaded or the existence of copyrighted material for which a takedown notice has been received, they have an obligation to remove it. Okay, so I'll take that as a yes. Okay. Thank you, Your Honor. Mr. Whelan. Good morning, Your Honor. May it please the court, Brian Whelan for the YouTube Apple East. I want to address all that Mr. Ortega says, but I do want to sort of start with, I think what is the, just the misconception or misrepresentation that- I'll say testimony. Yeah, the testimony and just the basic facts. He seems to be saying that we have actually used Content ID to match and find matches of his movies, and that is not true. There's no testimony that says that, and the court is exactly right. That's just not what the record says. The way that this- Not what the record says. Sure. And insofar as you can, tell us what you understand him to be relying upon that you say he's misconstruing what the record says. Of course. So I think what he is misconstruing or building his argument on is the fact that when videos are uploaded to YouTube, there is a scan that's done of them. And that's true. But the way that Content ID works is you take the videos that you've scanned and then you're comparing them to some corpus of videos that is in the YouTube's Content ID database. That's the way that you find matches. So the question is- The only ones that go in the Content ID database are the ones where the copyright holder has signed up for that. That's exactly right. Which they refuse to do. That is, you have it exactly right. Or they send you a takedown notice and you use the ID technology to figure out whether a takedown is required or not. So their legal position is that when they send us a takedown notice, we have an obligation to somehow put the clip that was taken down into the database and use it to look for other- Into the Content ID database. Right. But we do not do that. So his argument is that we've already done it and we're just ignoring the matches that we found. That's not true. Nobody said that. There's no testimony that remotely suggests that. And as you point out, the reason that that's not true, we easily could have put their clips in our database if they had agreed to use Content ID back in 2015, but they refused to do that. So the clips were never matched. They were never there. They didn't want to sign the release. There actually was no release. And that's in the record too. It was a contract that had requirements governing how the Content ID system- They deemed it as a release and didn't want to go along with it. Let's just assume that's true. Yeah. Whatever reason they had for not wanting to sign it, that's their choice. But having made that decision, it had consequences, one of which was that YouTube never was able to match their content using the Content ID technology. The way you do it right now, you put into that bucket, you put into the Content ID, you put in the infringing clip, or you put in the copyrighted work? The way Content ID works now? Yes. So what happens is the database that you're looking for matches of consists of primarily videos that are given to us by rights holders that are participating in the Content ID system, who have entered into that agreement that governs Content ID. Then that database is scanned against all the videos that are uploaded to YouTube. I just, I wanted to make sure I didn't misunderstand. When you say clips, you mean the copyrighted works that are put into the Content ID bucket? If I understand your question, yes. You don't dump the infringing clips that are posted into that. You put in the copyrighted works or a sample of the copyrighted works in there. And then if someone participates in Content ID, then that's used to match. Yes, at the time relevant to this case, that's exactly how it worked. Now, so- And that works on an ongoing going forward basis. Yeah, so Content ID is used to scan videos at the time they're uploaded to YouTube. And then I believe that there's some occasional sort of look back where it's scanning the corpus of existing YouTube videos. But the main operation is to find newly uploaded material. So having, I think, dispelled sort of the factual misconception that my colleague made, that sort of takes us to the legal argument, which you were referencing, Judge Jordan, which is, I think the heart of this case should be the heart of this case. It's certainly what the district court properly addressed, which is the question of whether, as a matter of statutory interpretation, their argument that we have an obligation to use Content ID in a way that we're not using it to affirmatively look for potential matches of the videos that they've taken down via their takedown notices, whether that's an obligation that we have. Now, he seems to be retreating from the argument that somehow you should depart from the Second Circuit and the Ninth Circuit's decision on that point. I can, I guess, understand why he doesn't wanna tell you that, because that's a lot to ask. Those courts looked at the text of the statute. They looked at the legislative history. They looked at the policy. And they came to the conclusion, which we think is exactly right, that the obligation to affirmatively look for infringing content, whether that's in response to a takedown notice that identifies certain things or otherwise, is simply an obligation that the DMCA does not impose, and indeed that the DMCA expressly rejects. So I don't wanna, I think the court understands that argument, but I think it is clearly supported by the text of 512M. It's supported by the language of the takedown notice provision. What do you think the relevance of subsection M is? I mean, it's title suggests that it's more narrow. The text is more expansive. So how do you think it plays out in this case? Sure, I mean, both the Second Circuit in the Viacom case and the Ninth Circuit in the Shelter Capital case did look at the title and said, well, it talks about privacy, but the text is the text. We interpret statutes based on their text, not their title. The relevance of the statute, as those courts and others have recognized, is that DMCA safe harbor eligibility is not and cannot be conditioned on affirmatively looking for copyrighted material. And what that means in the context of this case is that there is no requirement that the DMCA imposes to build, implement, or use a technology like Content ID, which is an affirmative search technology that YouTube did voluntarily. So the statute makes very clear, we think, that using that technology is not required and the failure to use it or the alleged failure to use it, whether in response to a takedown notice or otherwise, cannot be a basis for withdrawing YouTube's DMCA safe harbor protection. And that, I think, is the nub of their argument. That's the argument that they made below. That's the argument that the district court correctly rejected. Now, to the extent that they wanna try to pivot away from that argument and say, no, no, no, we're not requiring you to do that because you already have done it, as we've talked about, that's just not supported by the record. So the other thing I would say is that if you just look at the language of the takedown notice provision itself, which requires copyright owners to identify the location of the material that they're claiming to be infringing and provide information reasonably sufficient to allow the service provider to remove that material and to do so expeditiously, as the statute requires, I think that's further confirmation that a DMCA notice is required to identify with some degree of specificity what in particular the rights holder believes to be infringing and to allow the platform, in this case, YouTube, to find and remove that material, not to go hunting for other stuff. Your position is that it's a practical matter based upon the testimony or evidence presented here that usually consists of a URL. That's right. The way that YouTube is organized, I mean, obviously, YouTube is a site that has billions of individual videos. Those videos are uploaded at different times by different people and they're located at different places within the YouTube website. So as a practical matter for YouTube, the way that copyright owners in their takedown notices need to identify the content that is to be removed is by giving us a URL. Now, we don't say that that's invariably required on any conceivable website, but for YouTube and services like it, that is right. And that's what the Ninth Circuit said in the Motherless case involving another smaller video website. So yeah, and that's been kind of the standard practice for YouTube takedown notices for well over a decade since the Viacom case. The only other thing I would say, and it sort of picks up on something that you were saying, Judge Jordan, which is we think this is clearly the right interpretation of the statute, and it's clearly the interpretation of the statute that's compelled by existing case law. We also think it makes sense as a matter of policy. It makes sense both because the notion that when a service provider like YouTube develops technology that goes above and beyond the DMCA floor, it shouldn't then be saddled with additional obligations that other platforms that are just doing the bare minimum don't have. So that's one point. But the second point, and maybe more important point, is what you were averting to, which is that using content ID in this kind of indiscriminate and unsupervised way that our adversaries are asking will result in the removal of non-infringing content, and it will harm legitimate users. And I just wanna say that the record in this case sort of illustrates that. It's undisputed that Athos sent takedown notices for videos that were uploaded by their own subsidiaries that therefore would not have been infringing. It's undisputed that they sent takedown notices for videos that were pretty clearly fair uses. And it's undisputed that they sent takedown notices for videos that they, it turns out, didn't own the copyright for. So all of that mean, and this is not uncommon, as I'm sure you can imagine. So the use of content ID in this way basically would have very serious ripple effects. It magnifies the consequence of any erroneous takedown notice, and it means that a lot of non-infringing content is going to be blocked in ways that Congress did not want to happen. Mr. Whelan, I'd like to change the focus of the discussion just a little bit if I can. We've talked pretty much all morning about actual knowledge, red flag knowledge. I'd like to have you help me with the second requirement. That is that the provider does not receive a financial benefit from the infringing activity provided it has the right and ability to control the activity. The exact language is does not receive a financial benefit directly attributable to the infringing activity where you have the right and ability to control. Hold aside for a moment the right and ability to control such activity. Help me with the financial benefit. Did you not receive a financial benefit in ad revenues here? The reason I raise it is when I looked at the materials that were submitted in this case, there were 9% out of the total of 100 that showed some financial benefit. Tell me why that is not directly attributable assuming we pass over the control issue. Sure, and I would just say the control issue, if you find no control. I understand we never get to this question. Let's just assume control for the purposes of my question. Sure, happy to address that. So with respect to the 9% of clips, and I wouldn't say they had a financial benefit, what I would say is that there was some evidence that there was advertising that was sort of shown in conjunction with those clips. The Ninth Circuit has said that financial benefit has to be distinctly attributable to infringement, and the legislative history tells us that having an ad-supported business model is generally not enough. The reason I say it is when I looked at your expert here of the clips in suit asserted by the plaintiff in Exhibit A of the amended complaint, the uncontested evidence showed that only 9% generated any advertisement revenue, and there's no challenge from the plaintiff about the district court's conclusion that of the total of the clip in suit, 91% generated no advertising revenue, so there's the remainder of the 9%. Is that directly attributable? We don't think it is, and I think the case that's probably closest or best on this point is a case from the Southern District of New York, fairly recent case called Oath Against Downs, which we cited in our brief. It's a case involving the Huffington Post, and in that case, you had an article that was posted on Huffington Post that had an ad embedded in the article, and it turned out the article used infringing material, and what the court said there is the fact that there's coincidentally some advertisement that happens to show up in connection with a video that later is found to be or alleged to be infringing or a piece of material that's later found to be infringing is not enough under the DMCA's financial benefit analysis to create a potential disqualification, and instead, and this is consistent with, if you look at the Ninth Circuit's decisions in the Fung case, which finds financial benefit, and the Motherless case, which does not, typically what the courts are looking at when they're looking at financial benefit consistent with the legislative history of the statute is that there's something in the business model that is skewed to trying to benefit from infringing content. The problem is the revenue could have come from any other non-infringing content. Exactly, it's sort of just coincidental. And therefore, it couldn't be direct. That's our position, exactly. Happy to address the control issue if the court has questions. Please. Sure. So on control, the main argument that they've made is simply that the DMCA codifies the vicarious liability standard. That's an argument that was rejected very expressly by the Second Circuit and the Ninth Circuit. And instead, what those courts have said, and we think this is correct, is that you have to show something more than just sort of generalized control of your platform. You have to show that the service participated in or somehow induced infringement. And the district court looked at exactly that, and I think based on the undisputed evidence, found that there was simply no triable issue of fact. And I would say that everything that they've relied on on that issue is pretty much what was argued in the YouTube versus Viacom case a decade ago. Essentially that YouTube has technology that it uses to try to monitor for infringing content, and YouTube has content moderation policies that allow it to take down content and runs advertisements. So all of those arguments were considered. They were all rejected, specifically involving YouTube, and we don't think there's any, there's nothing in this record that suggests any basis for a different conclusion here. Thanks very much. Thank you, your honors. Appreciate your time. Thank you, Mr. Whelan. Mr. Ortega, you've saved five minutes. I want to address Mr. Whelan's suggestion that we're backing away from our claim that the second and ninth decisions were wrong. We're not backing away from it. I was just addressing the low-hanging fruit of the granting of a motion for summary judgment when there was evidence sufficient to not have to address that. We have no question and no doubt that the Second and Ninth Circuit's decision is not appropriate under today's technological background. That would, at the time that the Viacom cases came out, that technology that they are implementing now just simply did not exist. Facebook had been, by the time the DMCA came out, Facebook wasn't in existence. The time Viacom came out, we had the first iPhone. So you cannot apply, and I cannot imagine this Court believes that the Congress decided to draft the DMCA solely with a view as to the technology that was in existence at that time. I take your point on that, and I think you're probably right that it was forward-looking to some degree, but you rely to a large degree on the Copyright Office's report, which is sort of a primer from the Copyright Office's perspective to Congress as what it should do to modernize the DMCA and specifically the safe harbor and indicates that not everybody's happy with the way the safe harbor's operating, that a lot of copyright holders think that it's ineffective and forces them to do what your client has been forced to do. But that may be a prescription for legislative change, not for a different interpretation of the statutory text. My issue with that, Your Honors, is the Copyright Office is pointing out what the issues are. Copyright Office, I'm sure, was not going to sit there and say, well, the Ninth and Second did this wrong, but this Court can, and this Court does not have to simply agree that if the Second and the Ninth said 10 years ago, this is the way we're gonna apply it, that the language, which is plain and clear, and I'm going to read it to the Court so that we are not lost in anything. What they've asked for is, in the absence of such, and this is subsection two, in the absence of such actual knowledge, is not aware of facts or circumstances from which activity is apparent. They know this. Not only do they know this, but counsel even said it. His argument, to Your Honors, was it easily could have been done. This is not a situation where- But it wasn't done. You're asking them to make it apparent. You're asking them to do, because you think that they're technologically able to do it, you're asking them to do something that they don't currently do, or otherwise lose the safe harbor, right? We are, and the reason we are is because, pursuant to the statute, if they have, there is no question, and this is why I believe in our facts of our case, summary judgment was not appropriate. If I have to give you repeated takedown notices for the exact same movie, then you, YouTube, cannot simply say, I don't have any reason to believe. What do you mean by repeated notices? Because every clips are gonna be different. Your takedown notice is not going to be the same. It may relate to the same copyrighted work, but the infringing clips are not necessarily going to be the same. They are, and that's- No, that's not true. You may have a two-hour movie, and you may have a clip of the last 30 minutes of the movie, which someone thinks is the best thing that ever happened to cinema, and it's not fair use, and it's infringing, and you send down a takedown notice of that. Now somebody else puts in the first 30 minutes, and they say, oh, wow, that's the thing to die for, is the first 30 minutes. Why are those two things the same? Your Honor, it's the same in the following sense, because it's the material at issue, it's not the address, and that's what counsel said. Right, so it's you, again, your position, and again, I'm not saying you're wrong, but your position is that once you give them notice of a copyrighted work, because of their technology, they have an obligation to scan their system going all the way forward for anything that might be infringing. The answer is yes, and the reason I'm bootstrapping this answer yes is because they specifically said every time before we load anything, we fingerprint it to match it to our content. That's their testimony, not mine. I didn't make this up, and so they cannot simply. But is that the same thing as content ID? That is their position as to how they want to call it. No, no, no, I'm asking you based on the record. Is the fingerprinting that results the same thing as content ID and running something through content ID, according to the record? According to the record, they have two different things they call it. They call it hash technology, hashing, where they identify and provide a hashing tag to everything that's uploaded, and they look at it before they allow it, and that was the testimony. They look at it before they allow it. I am out of time, and I appreciate the court's time, and we'd ask the court to reverse the lower court's decision on summary judgment. Thank you, Mr. Ortega. We'll move to the last case.